[Sac. No. 2605. Department Two.—August 8, 1918.]

E. PHOEBE DOOLITTLE, Respondent, v. THADDEUS C. McCONNELL, as Executor, etc., Appellant.

ESTATES OF DECEASED PERSONS—ACTION ON CLAIM FOR SERVICES—PLEADING—AMENDMENT OF COMPLAINT—ABSENCE OF VARIANCE.—In this action upon a rejected claim by a niece against the executor of the will of her deceased aunt for services rendered to the aunt in her lifetime under an alleged oral agreement by the terms of which the plaintiff was to care for her aunt and manage her household affairs, and the aunt was to compensate plaintiff therefor, if not in the aunt's lifetime then by provision in her will, it is held that there were no essential differences between the contracts alleged in the. second and third complaints and that finally proven as to require a decision that either was at variance with the creditor's claim upon which the action was brought.

PLEADING—AMENDMENT OF COMPLAINT—ADDITION OF ESSENTIAL MATTERS—STATUTE OF LIMITATIONS.—Where there is no attempt to state a new cause of action in an amended complaint, but merely the addition of matters essential to make the original cause of action complete, the amendment, though made after the expiration of the period of limitation, relates back to the time of the commencement of the action.

ESTATES OF DECEASED PERSONS—FORM OF CLAIM.—The purpose of a creditor's claim against the estate of a deceased person is to advise the representative of the estate of its nature, and there is no requirement that it shall state the facts with all the detail necessary

in a complaint, nor is its sufficiency to be tested by the rules of pleading.

ID.—CLAIM FOR PERSONAL SERVICES—STATUTES OF LIMITATION—DATE OF CONTRACT.—A claim against the estate of a deceased person for personal services based on a contract need not state the date of the contract, but only the essentials thereof, where it appears there-- from that the claimant was not to be finally compensated until the death of her employer.

ID.—ACTION FOR SERVICES—PLEADING—STATEMENT OF THINGS DONE "IN PURSUANCE" OF CONTRACT.—In an action upon a creditor's claim for services rendered the deceased under an alleged agreement, state- ments in the second amended complaint that certain things were done by plaintiff "in pursuance" of the agreement were not mere conclusions of law, and the failure to strike them out is not a ground for the reversal of the judgment.

ID.—ORAL CONTRACT TO MAKE WILL—VALIDITY.—An oral contract to dispose of property on death in a particular way, made prior to the year 1905, may be enforced although many years have elapsed between the making of the contract and the action to enforce its terms.

ID.—ACTION FOR SERVICES—SUFFICIENCY OF EVIDENCE.—In this action on a creditor's claim for services rendered deceased under an alleged oral agreement, it is held that the evidence sufficiently supports the verdict in favor of the plaintiff.

ID.—EVIDENCE—RECEIPT IN FULL PAYMENT—CONSIDERATION BY JURY.— In such an action, a receipt signed by the plaintiff which on its face purported to be in full payment for services rendered was properly admitted in evidence, but it was for the jury to say whether or not under the evidence the receipt was signed by mistake.

ID.—VERIFICATION OF CLAIM BY ATTORNEY—LACK OF KNOWLEDGE— WHEN NOT ATTACKABLE.—A claim against an estate of a deceased person verified by the attorney for the creditor, the latter being absent from the state, cannot be successfully attacked on the ground that the attorney was without actual knowledge of the facts sup- porting the claim, where vouchers and proofs were not called for, and such attack was not made until the time for the presentation of claims had expired and suit had been brought on the rejected claim.

ID.—VERIFICATION OF CLAIM—ESSENTIALS.—A claim against the estate of a deceased person must be authenticated by a verification which on its face contains the essential matters prescribed by section 1494 of the Code of Civil Procedure.

APPEAL from a judgment of the Superior Court of Sac- ramento County. Wm. M. Finch, Judge Presiding.

The facts are stated in the opinion of the court.

C. E. McLaughlin, and White, Miller, Needham & Harber, for Appellant.

Grove L. Johnson, Wm. M. Sims, Jay L. Henry, and F. A. Plank, for Respondent.

MELVIN, J.—Defendant, as executor of the estate of Ellen M. Wilson, deceased, appeals from a judgment based upon a suit upon a creditor's claim. The amount of the judgment was fifteen thousand dollars.

Mrs. Wilson died in 1907. By her will all of her property was disposed of in a manner ignoring her niece, the plaintiff herein, her son, defendant herein, being the principal beneficiary under the testament.

The will was admitted to probate in May, 1907, and within the statutory time plaintiff presented a creditor's claim for twenty-five thousand dollars for personal services rendered her aunt, Mrs. Ellen M. Wilson, under a specific contract. It was set forth in the said claim that the services were rendered from August 6, 1902, to the time of Mrs. Wilson's death. This claim having been rejected by defendant, as executor of the estate of his mother, suit thereon was entered on June 10, 1908. The original complaint was amended in 1909, as appellant contends, by abandoning the original contract as alleged in the creditor's claim and counting upon one entirely different— a contention which we shall presently examine in detail. Upon the amended complaint two trials were held before juries, each trial resulting in a substantial verdict in favor of plaintiff, but each judgment was on motion set aside and·a new trial was granted. Upon the third trial, in 1916, at which another judge presided, plaintiff was permitted to file a new amended complaint and was again victorious before a jury. No motion for a new trial was made, but this appeal is prosecuted from the judgment.

Appellant makes a number of specifications of alleged error based upon the supposed radical difference between the original cause of action set forth in the complaint and that upon which issue was finally joined and trial was had resulting in the last verdict. Among other assertions of appellant is one to the effect that the new cause of action pleaded in the last amended complaint was barred by the statute of limitations.

In the original complaint it was alleged in substance that in 1902 Mrs. Ellen M. Wilson repeatedly represented to plaintiff's parents and sisters, who resided in Iowa, and to plaintiff herself, who had farming land in North Dakota, that said Ellen M. Wilson was wealthy; that her health was becoming impaired and that she was physically unable to manage her household affairs; that she was living alone; and that she desired plaintiff to accompany her to California. It was further alleged that Mrs. Wilson promised that if plaintiff would accompany her to California, would take care of her and would manage her household affairs, she would fully compensate plaintiff for such services, if not in Mrs. Wilson's lifetime, then by provision in her will. It is averred that plaintiff accepted the offer made by her aunt and that she came to this state. There are very extended allegations regarding the manner in which plaintiff complied with her agreement and in respect to the details of the care and attention bestowed by her upon Mrs. Wilson up to the time of the latter's death.

In the amended complaint of 1909 were alleged the same sort of duties which were to be performed by plaintiff under the agreement, and which according to the averments were performed during the same period as that specified in the original complaint and in the claim upon which it was founded. But it was averred that the contract was made not in 1902 but in 1887, by the plaintiff and Mrs. Wilson and the mother of plaintiff, and that by them it was agreed not that the plaintiff would then and there accompany her aunt to California, but that whenever Mrs. Wilson should write to plaintiff's mother for plaintiff to come to this state and live with her the plaintiff would do so, relying upon the promise of the aunt to see that the niece would be well provided for. It was alleged that in 1902 plaintiff came, in response to a request in a letter written to her sister, and that she entered upon the discharge of her duties in accordance with the agreement of 1887.

The amended complaint of 1916 differs very little from that of 1909. In both the time of the original agreement is given as the year 1887. In the amended complaint of 1909 the agreement alleged was that if plaintiff would come to California when requested, her aunt would see that she was *well provided for*. In the pleading of 1916, after the words "provided for," were added the words "during the life of said

Ellen M. Wilson and that at the death of said Ellen M. Wilson, she, the said plaintiff, would be, by said Ellen M. Wilson, amply and fully provided for and compensated for her said services.'' In this complaint for the first time occurs the formal allegation that Mrs Wilson did not by will or otherwise provide for plaintiff.

We are of the opinion that none of the minute and diversified specifications of alleged error, founded upon the supposedly vital differences between the contract set forth in the original complaint and the two described in the later pleadings, is of any force. The essence of plaintiff's action against the estate was her claim for services rendered during certain years pursuant to a certain agreement. Even if we should concede that the first complaint failed to state a cause of action, we would not be forced to the conclusion that the statute of limitations barred all possibility of recovery because there was no complaint which should have withstood an attack by demurrer during the time between the filing of the original and the preparation of the amended pleading. Nor is there anything so essentially different between the various contracts alleged and that finally proven as to require us to decide that either the one in the second or that in the third complaint set forth was at variance with the creditor's claim against the estate. These phases of the pleadings are so well analyzed in the opinion filed by the learned judge of the superior court who presided at the last trial, that we take this occasion to quote and adopt his language used in ruling upon the application to file the second amended complaint. He said:

''Counsel for the defendant contend that the complaint on file (first amended complaint) does not state a cause of action and that the proposed amendment must therefore be treated as the commencement of the cause of action therein stated against which the statute of limitations has run.

'' 'Where there is no attempt to state a new cause of action in an amended complaint, but merely the addition of matters essential to make the original cause of action complete, the amendment, though made after the expiration of the period of limitation, relates back to the time of the commencement of the action. This was expressly held by the district court of appeal for the first district in *Rauer's Law etc. Co.* v. *Leffingwell,* 11 Cal. App. 494, [105 Pac. 427], in which a rehearing was denied by this court, where the original complaint on a

promissory note did not contain an allegation of nonpayment, an allegation absolutely essential to the statement of a cause of action. The amended complaint was filed after the statute would have run, if it had not been for the original complaint.' (*Ruiz* v. *Santa Barbara Gas etc. Co.*, 164 Cal. 194, [128 Pac. 330].)

"It is further objected that whether or not the complaint on file states a cause of action the proposed amendment states a new and different cause of action barred by the statute.

"This presents a problem not easy of solution and concerning which the decisions of our own state seem not altogether in harmony.

" 'On this point I find no general rule laid down by the decisions in this state. All that is said is, that great liberality should be used by the courts in allowing amendments (*Burns* v. *Scooffy*, 98 Cal. 276, [33 Pac. 86], and cases cited) ; and that the allowance of amendments is a matter within the discretion of the courts. (*Coubrough* v. *Adams*, 70 Cal. 378, [11 Pac. 634] ; *Lestrade* v. *Barth*, 17 Cal. 286.) And in practice the courts have been extremely liberal, as, e. g., in *Heilbron* v. *Heinlen*, 72 Cal. 376, [14 Pac. 24], where the complaint was amended so as to describe a different tract of land from that described in the original complaint; or in *Walsh* v. *McKeen*, 75 Cal. 519, [17 Pac. 673] , where the case was changed from an action at law to a case in equity; or in *Cox* v. *McLaughlin*, 76 Cal. 60, [9 Am. St. Rep. 164, 18 Pac. 100]', where the change allowed was from an action on a special contract to an action on a *quantum meruit;* or, as in *Castagnino* v. *Balletta*, 82 Cal. 256, [23 Pac. 127] , where the change was from an action on a mechanic's lien to an action on the special contract, or in *assumpsit;* or in *Bogart* v. *Crosby*, 80 Cal. 195, [22 Pac. 84] , where the principal debtors, who had been omitted from the original complaint, were brought in by amendment. . . .

" 'It is obvious that the unqualified way in which the rule is sometimes stated—i. e., that a new or different cause of action cannot be introduced by amendment—cannot be accepted. For the most common kinds of amendments are those in which the complaints are amended that do not state facts sufficient to constitute a cause of action; and in these, and often in the case of new parties, a new cause of action is in fact for the first time introduced. All that can be required, therefore (to use the language of Mr. Pomeroy), is, that "a wholly different

cause of action'' shall not be introduced; or, as said by the court in *Shields* v. *Barrow,* 17 How. (U. S.) 130–146, [15 L. Ed. 158], that ''a complainant (is not) at liberty to abandon the entire case made by his bill, and make a new and different case by way of amendment,'' or ''to strike out the entire substance and prayer of his bill, and insert a new case by way of amendment''; or, as expressed by this court in an early case, the matter of the amendment must not be ''entirely foreign to the original complaint.'' (*Frost* v. *Witter,* 132 Cal. 424, 425, [84 Am. St. Rep. 53, 64 Pac. 705].)

''The following cases further illustrate the liberality of the rule:

''In *Porter* v. *Fillebrown,* 119 Cal. 238, [51 Pac. 322], the complaint in an action at law upon a creditor's claim for a sum less than three hundred dollars and, hence not within the jurisdiction of the superior court, was amended so as to make it an equitable action for an accounting of a trust within the court's jurisdiction; in *Union Lumber Co.* v. *Schouten,* 25 Cal. App. 80, [142 Pac. 910], the complaint alleging an action for goods sold and delivered was amended to allege an account stated; in *Mackroth* v. *Sladky,* 27 Cal. App. 112, [148 Pac. 978]; the complaint alleging a written contract to divide commissions was amended by alleging an oral contract instead of the written one; in *Merchants C. Agency* v. *Gopcevic,* 23 Cal. App. 216, [137 Pac. 609], and in *Turner & Dahnken* v. *Bauer,* 28 Cal. App. 311, [152 Pac. 308], the complaints were amended to change the causes of action upon express contracts to causes upon a *quantum meruit;* and in *Cowell* v. *Snyder,* 171 Cal. 291, [152 Pac. 920], the complaint in an action to recover for the rent of land and the price of rock quarried was amended to plead an account stated.

''In the latter case it is said, at page 294, [152 Pac. 922]:

'' 'Undoubtedly an account stated and mutually accepted by the parties does give rise to a new cause of action, and the statute of limitations on that cause of action begins to run not as of the date of the items of account but from the time of the agreement that the statement is correct. . . . . But the account stated arose out of the identical transactions pleaded in the original complaint, and it has repeatedly been decided that such an amendment as was here allowed is permissible, and is not subject to the bar of the statute of limitations.'

"The supreme court of new Hampshire in 1839 stated the rule in language which answers some of the defendant's objections as follows:

" 'The difficulty which sometimes exists, in the application of the rule, arises from the fact that almost all amendments change, to some extent, the cause of action, as originally stated. An amendment which changes the alleged date of a contract, or the sum to be paid, or any particular of the matter to be performed, or the time or manner of performance, changes, in one sense, the cause of action; but it is not in this sense that the rule is to be understood. Amendments of that character, so long as the identity of the matter upon which the action is founded is preserved, are admissible; the alteration being made, not to enable the plaintiff to recover for another matter than that for which he originally brought his action, but to cure an imperfect or erroneous statement of the subject matter, upon which the action was in fact founded. So long as the form of action is not changed, and the court can see that the identity of the cause of action is preserved, the particular allegations of the declaration may be changed, and others superadded, in order to cure imperfections and mistakes in the manner of stating the plaintiff's case.' (*Stevenson* v. *Mudgett,* 10 N. H. 338–340, [34 Am. Dec. 155].)

"Under the liberal interpretation of the rule as stated in the foregoing authorities I conclude that the plaintiff is entitled to amend."

In addition to the authorities cited in the foregoing quotation we might refer to *San Joaquin Valley Bank* v. *Gate City Oil Co.,* 170 Cal. 250, [149 Pac. 557] , and *Glougie* v. *Glougie,* 174 Cal. 126, [162 Pac. 118].

The same rules announced by the court in overruling appellant's various attacks upon the complaint as amended apply with greater force to the refusal to hold that there was a fatal difference between the creditor's claim as filed and the one upon which suit was brought, because the courts go further in upholding such demands against estates than in sustaining pleadings. Indeed, it is usually necessary in such cases to go more into details in the complaint than in the claim. In the claim as in the complaint the essential element was a substantial assertion of the contract and its fulfillment on the claimant's part. While the date of making the agreement as set forth in the creditor's claim against the estate differed

from that alleged in the complaint after amendment, the promise to be performed by Mrs. Wilson, as well as the nature of the services actually rendered and the time during which claimant performed those services, were all alleged in substantially the same form in the claim and in all the pleadings of the claimant. Plaintiff could recover for all of her services and could escape the bar of the statute of limitations only by showing that under her contract she was to be finally compensated upon the death of Mrs. Wilson. It was, therefore, necessary for her to put the essentials of the contract in the creditor's claim, but the date was not one of them. In *Thompson* v. *Orena*, 134 Cal. 26, [66 Pac. 24]·, the court was considering a suit based upon a claim for services performed for which payment was to be made upon the sale by decedent of certain land, which remained unsold at her death. In the creditor's claim the land was not described, and the omission of such description was not held fatal to the validity of the claim, the court holding that the only necessity for any reference to the land arose out of the fact that the claim should show that it was not barred by the statute of limitations. In *Western States Life Ins. Co.* v. *Lockwood*, 166 Cal. 185–196, [135 Pac. 496], it was held that such a claim need not be drawn with the precision which would render a complaint good against a special demurrer. The code does not prescribe the exact form of such a claim. The purpose of presenting such a demand is to advise the representative of the estate of its nature, and there is no requirement that it shall state the facts with all the detail necessary in a complaint nor is its sufficiency to be tested by the rules of pleading. (*Pollitz* v. *Wickersham*, 150 Cal. 238, [88 Pac. 911]; *Elizalde* v. *Murphy*, 163 Cal. 681, [126 Pac. 978]; *Enscoe* v. *Fletcher*, 1 Cal. App. 659, [82 Pac. 1075].)

Defendant moved to strike out as purely conclusions of law and redundancies certain parts of the second amended complaint—the one filed in 1916. Some of the parts at which the motion was directed were statements that certain things were done by plaintiff "in pursuance" of a certain agreement and statements of Mrs. Wilson. These were not mere conclusions of law and were no more subject to just criticism, as respondent's counsel correctly argue, than the allegation so frequently and properly used in pleadings that a plaintiff "duly performed all conditions and terms" of a contract "on

his part to be performed." Even if these expressions had been, as appellant's counsel contend, irrelevant and redundant, the failure of the court to strike them out would not be ground for reversal of the judgment. (Code Civ. Proc., sec. 475; *Sloane* v. *Southern California Ry. Co.*, 111 Cal. 668–686, [32 L. R. A. 193, 44 Pac. 320]; *Higgins* v. *San Diego Savings Bank*, 129 Cal. 184–186, [61 Pac. 943]; *Procter* v. *Southern California Ry. Co.*, 130 Cal. 20–24, [62 Pac. 306, 509].)

The testimony was conflicting, but there was sufficient evidence to sustain the verdict. It was the theory of the defendant's counsel that any agreement made in 1887 was, upon the view most favorable to respondent, merely an option which expired either by lapse of time or was revoked by other and later offers of employment. Even if it be conceded that the agreement was a mere option, there was substantial evidence in the case at bar to support a conclusion not only that the option had been exercised by Mrs. Wilson, but that she had stated to a number of her friends after Miss Doolittle came to live with her that the arrangement between them was one by which she was bound to provide in her will for her niece. The mere fact that fifteen years elapsed between the making of the original arrangement and a time when Mrs. Wilson's health was so impaired as to lead her to a conclusion that she wanted Miss Doolittle to come to California in fulfillment of the agreement does not destroy the validity of the option. It is well settled that if made prior to 1905, an oral contract to dispose of property on death in a particular way may be enforced, and it sometimes occurs that many years elapse between the making of the agreement and an action such as this. In the recent case of *Steinberger* v. *Young*, 175 Cal. 81, [165 Pac. 432], the oral agreement which was enforced had been made almost half a century before the death of Mrs. Ross, of whose estate defendant Young was the administrator.

The contention is likewise made that the "option" was withdrawn by the offers, made by Mrs. Wilson (of which there was some evidence), to pay plaintiff a certain wage if she would enter her aunt's employment. It is not contended that these offers were accepted, and they may be justly regarded as mere unsuccessful efforts to vary the terms of the original understanding. However, the agreement of 1887, as revealed by the testimony of members of plaintiff's family present when the

alleged conversation took place between Mrs. Wilson and plaintiff's mother, was not a mere option simply because performance on the part of Miss Phoebe Doolittle was to be postponed. The oral agreement did not differ in essence from those alleged and proven in such cases as *Steinberger* v. *Young, supra,* and *Rogers* v. *Schlotterback,* 167 Cal. 35, [138 Pac. 728]. The real issues of the case were admirably stated in an instruction offered by the defendant and given by the court, which was as follows:

"The claim of plaintiff, as set forth in the complaint, is as follows:

"That in the year 1887, the exact date plaintiff cannot state, Ellen M. Wilson said to plaintiff and the mother of plaintiff in Cresco, Iowa, that she wanted the mother of plaintiff to let plaintiff come to California and live with her, said Ellen M. Wilson, and to stay with her, to care for her, said Ellen M. Wilson, and that if she, said plaintiff, did so come to California, she, said Ellen M. Wilson, would see that plaintiff was well provided for during the life of said Ellen M. Wilson and that at the death of said Ellen M. Wilson, she, the said plaintiff, would be, by said Ellen M. Wilson, amply and fully provided for and compensated for her said services; and it was then and there stated to said Ellen M. Wilson by said mother of plaintiff and agreed to by the said plaintiff, that whenever said Ellen M. Wilson should write to said mother of plaintiff for plaintiff to come to her in California, that said plaintiff would leave the eastern states and her mother and her business and come to California to live with and care for said Ellen M. Wilson under said promise.

"That in pursuance of said proposition and agreement and statement the said Ellen M. Wilson did in July, 1902, write to the sister of the said plaintiff and in and thereby did request the plaintiff to come to California to live with her according to said proposition, agreement, statement, and conversation, and plaintiff, in pursuance of said conversation and proposition and agreement and statement so made in 1887 as aforesaid and of said letters from said Ellen M. Wilson to plaintiff's said sister, did, in August, 1902, leave her home and business interests in North Dakota and came to the home of the said Ellen M. Wilson, near said Elk Grove, Sacramento County, California, and immediately entered upon the discharge of her duties in accordance with said agreement above

set forth, and from that time until the death of said Ellen M. Wilson, plaintiff gave and devoted all of her time and attention to her said aunt and duly and properly cared for her, and in all and every respect fulfilled all of the conditions of said agreement by plaintiff to be done and performed and to the entire satisfaction of her said aunt; and

"Unless you are satisfied by a preponderance of the evidence that the particular contract so alleged was made between plaintiff and Ellen M. Wilson, then your verdict must be for the defendant."

The testimony of the brother and one of the sisters of the plaintiff was sufficient, if believed by the jury, to establish the first requisites for a judgment for plaintiff as outlined by the quoted instruction. Mr. George Doolittle, speaking of a time in 1887 and an occasion at his mother's home in Iowa when his mother, his aunt, Mrs. Wilson, and several of his sisters were also present, testified in part as follows:

"My aunt made the remark that my mother had more girls than she was entitled to. She thought she ought to have one. My mother said that when she needed one she could have one. My aunt said she would take Phoebe home with her now. My mother said no, she could not let Phoebe go just now, but at any time when she thought she needed her, if she wrote she would have Phoebe come, she says—My aunt went on to say as long as she lived she would see Phoebe was well taken care of, and if anything should happen to her, she would see she was provided for. Then my aunt went on to say she did not want any of her—she says: 'I don't want any of your girls, Jane, to do what you and I did, worked in kitchens, somebody's kitchen,' she says: 'The way I look at it, the other girls have got good educations, they are able to, they are teaching school, able to take care of themselves, not be under anybody else; Phoebe is the one I will take.' . . . About what she said was that she wanted Phoebe to come out and live with her and be a companion for her, that she was all alone, did not have anyone to stay with her." He also testified that his sister Phoebe was about seventeen years old at the time of that conversation. He also testified regarding a conversation with his aunt at her home in California after his sister had been living there and taking care of Mrs. Wilson for some time, as follows: "My aunt said that she made Phoebe an allowance of fifteen dollars a month as pin-money, so she could send her

mother some little things as she had been used to, to buy herself any little things; she said that in case anything happened to her, she intended to provide well for Phoebe.''

Eva R. Huska, a sister of plaintiff, corroborated their brother with reference to the conversation in Iowa in 1887. She also said that Mrs. Wilson told the mother of the girls, that if she should take one of them she would do well by the one who should come to her.

There was abundant testimony to the effect that Mrs. Wilson again and again declared her satisfaction with the manner in which Miss Doolittle ministered to her wants and managed her household affairs, and that she expressed her intention to pay for plaintiff's care of and devotion to her by a substantial provision to be made by her will. It will not be necessary to set forth all of this testimony. Its trend will appear from the few quotations which we shall make below.

Dr. Briggs, physician and pharmacist, who for some years practiced and conducted a drug-store at Elk Grove, Sacramento County, knew Mrs. Wilson well and frequently talked with her when she was well enough to ride out, which, he said, was ''a good part of the time.'' It was her custom to stop in front of the store, and as it was difficult for her to get out of the carriage, he would frequently go out and talk to her. Within six months after the arrival of Miss Doolittle at the home of Mrs. Wilson the latter had a conversation with Dr. Briggs, which he described as follows:

''She stated to me that she was very happy to have her niece with her; that her niece seemed to be the only one of the relatives that seemed to understand her, was willing to do the things that were necessary to make her comfortable. She stated that she was going to take care of her niece; that she did not know how long she would live. She had one stroke of apoplexy or cerebral hemorrhage, and she did not know how soon she might have another, and she stated that she was going to take care of her. . . . She said she was going to take care of her in her will, or make provision for her.'' This witness also testified that upon one occasion Mrs. Wilson said she was contributing to her niece's expenses, but would take care of Miss Doolittle more liberally in her will. The witness also related the following substance of a conversation with Mrs. Wilson: ''She said she would make ample provision for

her, she would not suffer in the world for comforts; she would make, she would provide well for her.''

Mrs. Walther, an acquaintance of more than thirty years, testified that Mrs. Wilson, speaking of Miss Doolittle, said " 'Phoebe is a good girl. I told her if she stayed with me as long as I lived, I would provide for her so she would never want,' '' and that in the same conversation Mrs. Wilson, speaking of her niece, said: " 'I am giving her a little monthly allowance now to buy clothes and little articles with.' ''

All of this testimony and more to the same effect tended to confirm the plaintiff's position with reference to the scope and meaning of the original agreement made in 1887.

It would unnecessarily prolong this opinion to quote at any length from the testimony of the many witnesses who told of the care and devotion bestowed by plaintiff upon her aunt. Suffice it to say that such testimony, if accepted as true, was amply sufficient to support that part of the case outlined in the latter part of the instruction quoted above.

It is the theory of the appellant that the sum of fifteen dollars per month allowed to Miss Doolittle by her aunt was intended to be and was in full payment for her services. It is, of course, admitted that witnesses told of conversations in which Mrs. Wilson said this monthly payment was merely an allowance for "pin money," but counsel insist that the acceptance by plaintiff from defendant of a sum of money and the signing of a receipt amounted to the final settlement of an account stated which precludes recovery in this action. The receipt was in the words and figures following:

"Elk Grove, April 17, 1907.

"Received of T. C. McConnell Forty Six Dollars & fifty cts. $46.50 in payment for labor in full for Estate of Mrs. E. M. Wilson.

"E. P. DOOLITTLE.''

It appears from Miss Doolittle's testimony that her cousin, the defendant, came to her and asked what was "coming to her." She, according to her testimony, replied: "There is fifteen dollars on my monthly allowance and two dollars and fifty cents for five days additional amount, and twenty-nine dollars I had advanced Auntie to pay her hired man." The receipt was given, if the date be correct, upon the day upon which the will was filed and some time before Mr. McConnell was appointed executor. The paper was, of course, admissible

as an admission, but it was for the jury to say whether or not it was, under all the circumstances, an admission of full payment of all that she believed herself to be entitled to receive under her aunt's will. When the receipt was given the defendant was not executor, and the document could not be regarded, in a strict sense, an account stated between plaintiff and the estate, but even if it be so regarded, there is nothing to prevent impeachment of such an account for fraud or mistake. (1 R. C. L. 218–220.) According to the modern doctrine, an account stated "simply affords strong presumptive evidence which may be rebutted by showing fraud or mistake." (1 C. J. 709.) Clearly, it was for the jury to say whether or not under the evidence Miss Doolittle signed the receipt through mistake.

It is asserted by appellant's counsel that respondent has no standing in court by reason of an improper verification of the creditor's claim. The affidavit attached to the claim was made by Miss Doolittle's attorney, who deposed as follows:

"That he is the attorney for E. Phoebe Doolittle, whose foregoing claim is herewith presented to the executor of said deceased. That the amount of said claim, to wit, the sum of twenty-five thousand dollars, is justly due to the said claimant, that no payments have been made thereon which are not credited, and that there are no offsets to the same to the knowledge of said affiant.

"That the reason why this affidavit is not made by claimant is that claimant is absent from the state of California and deponent is familiar with the facts of this claim."

The verification is made in substantial compliance with section 1494 of the Code of Civil Procedure, but appellant's counsel insist that because Mr. Sims, who signed it as attorney, was not employed by Miss Doolittle until after her aunt's death, and because, upon examination at the trial, he testified that, although he knew Miss Doolittle was living with her aunt, he knew nothing of their business relations until he was retained as an attorney, therefore he was disqualified to make the affidavit. Whatever may be the rule in other states, in California the courts have generally refused to be very technical in ruling upon matters of this sort. In *Estate of Swain,* 67 Cal. 637, [8 Pac. 497], the court refused to hold certain claims void because of faulty verification. It was there declared that a "claim" against an estate has reference to a

debt or demand which might have been enforced against the
decedent in his lifetime.   If the demand were the subject of a
suit during his life, and if the statement of the cause of action
were deemed objectionable, defective, or insufficient, the de-
fendant would have the right to demand a bill of particulars,
and similarly an executor or administrator might insist upon
"vouchers and proofs" to support a claim which has been pre-
sented.   (Code Civ. Proc., sec. 1494.)   It is true that in the
*Estate of Swain* the validity of the claim was established
*prima facie* by the administrator's approval, and the burden
of proof, therefore, was upon the heirs who assailed its
sufficiency; but that case is authority, we think, for holding
that an executor or administrator may not postpone an attack
upon a verification until after the rejection of the claim and
the bringing of suit thereon, when he has not called for vouch-
ers and proofs and when he bases his objections upon the sup-
posed lack of actual knowledge, on the part of the verifying
agent, of the facts supporting the claim.   Of course, the claim
must of necessity be authenticated by a verification which on
its face contains the essential matters prescribed by section
1494 of the Code of Civil Procedure.   (*Perkins* v. *Onyett*, 86
Cal. 348, [24 Pac. 1024].)   This verification does meet that
requirement.   (*Griffith* v. *Lewin*, 129 Cal. 596, [62 Pac. 172].)
In *Guerian* v. *Joyce*, 133 Cal. 405, [65 Pac. 972], the affidavit
of the claimant showed upon its face that she was ignorant of
the amount of some items of credit, yet the verification was
held sufficient.   The purpose of a claim against an estate is to
give the executor or administrator such information as will
enable him "to act upon it advisedly."   (*Western States
Life Ins. Co.* v. *Lockwood*, 166 Cal. 185–196, [135 Pac. 496].)
That case is also authority for a court's refusal to hear minute
technical objections based upon the supposed faulty verifica-
tion of a claim made long after the commencement of an action
and after the time for presentation of claim has expired.   The
court did not err in refusing to grant a nonsuit on the ground
that no legally verified claim had ever been presented to the
executor.

No other alleged errors require review.

The judgment is affirmed.

Lorigan, J., and Wilbur, J., concurred.

Hearing in Bank denied.