[Civ. No. 20084. Second Dist., Div. One. Nov. 22, 1954.]

TONY STOCKOVICH, Respondent, v. ACME SPRAY
PAINTERS et al., Appellants.

Crider, Tilson & Ruppe, A. H. Brazil and Jerome M. Budinger for Appellants.

Richard F. Harris and Lloyd E. Somogyi for Respondent.

DRAPEAU, J.—Defendants Ivan M. Ansite, James R. Ansite and Maurice J. Ansite, are copartners doing business under the fictitious name of Acme Spray Painters.

They were under contract with the State of California, through the Department of Public Works, to clean and paint the Little Pico Creek Bridge in San Luis Obispo County. The contract gave the state the right to inspect the work to insure conformance to specified workmanship and materials. A resident engineer was charged with this duty. Plaintiff was assistant resident engineer at the locality in question.

Safety aspects of defendants' equipment were under the supervision of the State Division of Industrial Safety. Defendant Arthur Alfred Ansite was superintendent at the job site.

Little Pico Creek Bridge is a 12 span, roll-beam, concrete deck bridge about 400 feet long and about 24 feet wide. A concrete curb runs on each side for its entire length with guard rails imbedded in the curbing.

Defendants used a movable scaffold in their cleaning and painting operation. This scaffold consisted of two carriages, one on each side of the bridge. These were wooden frames on wheels, straddling the guard rails and riding along the edges of the curbing.

From the carriages, a platform was suspended by rope blocks under the deck of the bridge. Using this platform,

which extended across the entire width of the bridge, the workmen sandblasted and painted the steel I-beams supporting the bridge deck. The platform was supported by rope blocks at both ends. It was also supported in the middle by a brace hooked to an I-beam running under the bridge.

When the work was commenced in early August, 1950, the scaffold was not equipped with counterweights. A few days later, plaintiff noticed that the carriage rollers inside the guard rails raised an inch or two while defendant Arthur Ansite was descending to the platform. This was corrected by fastening a bucket of sand to each of the inside carriage frames. Thereafter, plaintiff used the scaffold almost daily without difficulty. After an inspection by the Division of Industrial Safety a month later, a sandbag was added to each carriage as additional counterbalance. These were the size of an ordinary sack of cement weighing 125 to 150 pounds.

During operations the sandbag on the west carriage was located at different points on the carriage frame; sometimes it was wired to the frame, and sometimes it was merely laid on the carriage.

On the morning of October 4, 1950, the scaffold was set up in the middle of span No. 10 of the bridge. Defendants' crew that morning consisted of superintendent Arthur Ansite and two workmen: Arthur Francis and Arthur McGowan. Mr. McGowan testified that after their arrival they walked over to the scaffolding and "It was noted that there was something wrong. Q. And what was that? A. The bag of sand that ordinarily was on the carriage, I guess you'd call it, on the ocean side, was missing"; a red lantern was standing in the middle of the roadway and two lanterns were missing. "We noticed that the missing bag of sand was lying in the creek bed below, almost directly below the carriage from which it had been removed. Q. By 'We noticed,' to whom do you refer by 'We'? A. Mr. Ansite and Mr. Francis and myself." The bucket of sand was still in place.

Without returning the sandbag to the carriage, defendant Arthur Ansite and Arthur Francis descended to the platform from the deck of the bridge by sliding down the ropes of the block and tackle secured to the west carriage. They proceeded to sandblast the bridge. At this time the platform was suspended about 12 feet above the ground and 7½ to 9 feet under the bridge deck.

An hour later, plaintiff arrived at the scene. He parked his car and talked to Arthur McGowan who was operating

the compressor and servicing the sandpots. He then walked over the creekbed to span No. 10 at the north end of the bridge. He watched Ansite and Francis from below for less than an hour. When they finished the area on which they were working, plaintiff told them that certain spots on the steel required closer inspection and not to move the scaffold until he could get a better look from the platform upon which the two men were standing.

Plaintiff climbed up the embankment to the north end of the bridge and walked along the deck of the bridge to the west carriage at span No. 10. He then shouted that he was coming down. He stepped across the guard rail and got one foot on the lower horizontal bar of the carriage preparatory to sliding down one of the rope blocks to the platform. At that moment the carriage tipped over with a sudden jerk and plaintiff fell to the ground sustaining serious injuries.

The jury returned a verdict in favor of plaintiff for $19,068.96. Defendants' motion for a new trial was denied. This appeal is taken from the judgment on the verdict.

Appellants first urge that they were under no duty to warn respondent of an obvious danger, to wit: that a sandbag was missing from the carriage. Respondent replies that that was a question for the jury to decide. But say appellants, the jury had no opportunity to make such decision because of conflicting instructions.

Among other things, the jury was instructed that an invitor has no duty to give an invitee notice of an obvious danger.

It was also instructed as follows: ''If, after considering all the evidence, you should find that an invitor-invitee relationship existed between defendants and the plaintiff, then it was the duty of the defendants in the conduct of the cleaning and painting of the Little Pico Creek Bridge, to use ordinary care to avoid injury to the plaintiff, and it was also defendants' duty to use ordinary care to keep the scaffold from which plaintiff fell in a condition reasonably safe for the plaintiff.''

Appellants assert that by omitting in the last quoted instruction the qualification as to whether the danger was obvious, deprived them of the jury's determination on that issue.

An examination of all the instructions given discloses that the jury was fully and fairly instructed on the various issues presented, including the invitor-invitee relationship and obvious danger. There is nothing in the instruction complained

of which could lead the jury to believe it was of such controlling importance, that it overrode or did away with other issues likewise covered and submitted to it.

Moreover, the evidence produced on the question of obvious danger was in direct conflict:

The witness McGowan testified, as hereinbefore noted, that the sandbag was missing from the carriage early in the morning of October 4th, and that it was lying in the creek bed underneath the platform.

 Respondent testified that no one told him that anything irregular had been encountered when the crew arrived on the job; that Mr. McGowan never mentioned to him that he had seen a lantern in the middle of the road, or that he had seen the sandbag in the creek bed. Further, that after talking to McGowan, he walked over to the place where Arthur Ansite and Mr. Francis were working on the scaffold. And in answer to the question: "Did you notice anything unusual in any way on the creek bed there?" respondent said, "No, I did not. Q. Did you notice any sandbags? A. No."

The witness Arthur Ansite testified that he arrived at the job about the same time as Mr. McGowan. That shortly after, when he walked across the bed of the creek to the platform, there was nothing irregular about the scaffolding or the equipment at the bridge; that everything was in perfect order; that when he first saw respondent, he was lying on the ground; that this was about an hour and a half after the witness started to work; and that he helped carry respondent to the deck of the bridge. He also testified that up to the time when he went down to help respondent, he had not noticed any irregularity with respect to the equipment. Continuing: "Oh, you noticed some irregularity when you got down to Mr. Stockovich? A. Yes, sir. Q. What was that? A. One of my sandbags laid three or four feet from where he lay."

In this state of the evidence: one man testifying that he saw the missing sandbag lying in the creek below the platform on the morning in question; one man testifying that he did not see it; and the third man, that he did not see it until after respondent had fallen;—whether or not the danger was obvious became a question of fact for the jury to determine. See *Revels* v. *Southern Cal. Edison Co.*, 113 Cal.App.2d 673, 678 [248 P.2d 986], where the court stated: "While a general contractor is not under a duty to warn an employee of a subcontractor of obvious danger, the question whether the dan-

ger was obvious is a question for the jury. (*Dingman* v. *A. F. Mattock Co.*, 15 Cal.2d 622, 625 [104 P.2d 26]; 19 Cal.Jur. 585, § 27.)''

In the circumstances presented, the jury's implied finding that the existing danger was not obvious is well supported.

▆ It is urged that respondent was guilty of contributory negligence as a matter of law. This for the reason that he knew or in the exercise of ordinary care should have known of the existing danger. However, under the evidence produced, this issue was one of fact which the jury impliedly found in favor of respondent. He was not informed of the conditions found by the working crew when they arrived at the site on the morning of the accident. He did not observe any irregularity at the bridge, and normal operations were being carried on from the platform. Even though respondent had noticed the missing sandbag, so far as he knew the sand bucket which was in place was an adequate counterbalance.

As was so aptly stated in *Anthony* v. *Hobbie*, 25 Cal.2d 814, 818 [155 P.2d 826]: ''The rule has been stated in various ways in a legion of cases, that contributory negligence is not established as a matter of law unless the only reasonable hypothesis is that such negligence exists; that reasonable or sensible men could have drawn that conclusion and none other; that where there are different inferences that may be drawn, one for and one against, the one against will be followed; and that before it can be held as a matter of law that contributory negligence exists, the evidence must point unerringly to that conclusion. (Citation of authorities.)''

▆ Appellants assert that the court erred in refusing to instruct the jury on the doctrine of assumption of risk. They admit that the instruction submitted by them contained the words: ''when he knows or in the exercise of ordinary care would know that a danger existed.''

In the late case of *Prescott* v. *Ralphs Grocery*, 42 Cal.2d 158, 161 [265 P.2d 904], it was stated:

''The defenses of assumption of risk and contributory negligence are based on different theories. Contributory negligence arises from lack of due care. The defense of assumption of risk, on the other hand, will negative liability regardless of the fact that plaintiff may have acted with due care. (See Prosser on Torts (1941), p. 377.) It is available when there has been a voluntary acceptance of a risk and such acceptance, whether express or implied, has been made with knowledge and appreciation of the risk. (See Rest.,

Torts, § 893.) Where the facts are such that the plaintiff must have had knowledge of the hazard, the situation is equivalent to actual knowledge, and there may be an assumption of the risk, but where it merely appears that he should or could have discovered the danger by the exercise of ordinary care, the defense is contributory negligence and not assumption of risk. (*Hayes* v. *Richfield Oil Corp.*, 38 Cal.2d 375, 385 [240 P.2d 580] ; see Prosser on Torts (1941), p. 386.)''

■ Applying these principles to the facts of this case, the requested instruction was erroneous, and the trial court was not under a duty to revise it to state the law accurately, as appellants urge. (*Tossman* v. *Newman*, 37 Cal.2d 522, 525 [233 P.2d 1].) ■ Moreover, an instruction on the doctrine of assumption of risk was not warranted by the evidence.

■ It is also contended that respondent's cause of action as alleged in his first amended complaint is barred by the statute of limitations : subdivision 3, section 340, Code of Civil Procedure.

In this connection, appellants assert that the original complaint alleged a cause of action based upon negligence in the maintenance and operation of a scaffold. And that the first amended complaint has added an entirely new cause of action by alleging a contract between appellants and the State of California relative to inspection of the work at the job site by a representative of the state.

Paragraph IV of the amended complaint which alleged such contract containing the inspection requirement, was denied by appellants because of their insufficient knowledge, information or belief. The cause proceeded to trial on the issues thus presented. During the trial, appellants personally obtained leave of the court to file their fourth separate defense to the first amended complaint, to wit: that the cause was barred by the statute of limitations (Code Civ. Proc., § 340, subd. 3).

Thereafter, the trial court denied appellants' motion for a directed verdict based upon that defense.

The contract so pleaded was received in evidence and appellants admitted that respondent, as state inspector, had a right to inspect the job with respect to its compliance with the terms of the said contract.

The Supreme Court in *Stockwell* v. *McAlvay*, 10 Cal.2d 368, 375 [74 P.2d 504], quoting from *Doolittle* v. *McConnell*, 178 Cal. 697, 701 [174 P. 305], held: ''Where there is no attempt to state a new cause of action in an amended complaint,

but merely the addition of matters essential to make the original cause of action complete, the amendment, though made after the expiration of the period of limitation, relates back to the time of the commencement of the action."

In *Wennerholm* v. *Stanford Univ. Sch. of Med.*, 20 Cal.2d 713, 717 [128 P.2d 522, 141 A.L.R. 1358], it was urged that an amended complaint was barred by the statute of limitations because it stated a new cause of action, i.e., from negligence to fraud. It was there held: "Unless the amended complaint sets forth an entirely different cause of action from the original, however, the amended complaint, for the purposes of the statute of limitations, must be deemed filed as of the date of the original complaint. (Citation of authorities.) The modern rule, where amendment is sought after the statute of limitations has run, is that the amended complaint will be deemed filed as of the date of the original complaint so long as recovery is sought in each complaint upon the same general set of facts. (Citation of authorities.)" See also *Vogt* v. *Lazar*, 98 Cal.App.2d 406, 411 [220 P.2d 418].

The instant action is one for the recovery of damages for personal injuries sustained by an invitee as result of alleged negligence of an invitor. The original complaint alleged that the invitee was an inspector in the employ of the state.

The first amended complaint alleged a contract between appellants and the State of California for the painting of the Little Pico Creek Bridge which contained a provision for inspection of the work. In addition, the amended complaint contained all of the allegations of the original complaint.

This was not an attempt to state a new cause of action, but merely the addition of matters essential to make the original cause of action complete. There has been no change in the relief sought. The trial court properly denied appellants' motion for a directed verdict, for the reason that the amended complaint must be deemed to have been filed as of the date of the original complaint.

The judgment is affirmed.

White, P. J., and Doran, J., concurred.